O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ARTHUR ELLERD AND JOSE TROCONIS, on his own behalf and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, a California Municipality,<br><br>Defendant. | Case No. CV 08-4289 CAS (FFMx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR DECERTIFICATION**<br><br>**ORDER DENYING DEFENDANT'S MOTION TERMINATING SANCTIONS OF ENTRY OF DEFAULT JUDGMENT AGAINST PLAINTIFFS WHO HAVE FAILED TO RESPOND TO DISCOVERY, SERVE VERIFIED DISCOVERY RESPONSES, OR APPEAR FOR DEPOSITION; AND REQUEST FOR MONETARY SANCTIONS** |

## I. INTRODUCTION

On June 30, 2008, plaintiff Arthur Ellerd filed the instant "collective action" against defendant the County of Los Angeles ("the County") for "overtime compensation and other relief" pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201-209 ("FLSA").

On February 9, 2009, pursuant to a stipulation by the parties, plaintiffs Arthur Ellerd and Jose J. Troconis filed a first amended complaint ("FAC") against the County alleging that the County failed to pay plaintiffs, and other similarly situated employees, overtime wages in violation of the FLSA. Plaintiff alleges that he was

employed by the County as an Adult Protective Services Social Worker ("social worker") from approximately June 30, 2005, through January 3, 2007. Plaintiff further alleges that he, and other similarly situated employees, "were not regularly paid time and one-half of their rate of pay for all hours worked in excess of forty (40) hours per week during one or more work weeks." FAC ¶ 8.

On August 10, 2009, the Court granted plaintiffs' motion for conditional certification of a collective action, issuance of class notice, and equitable tolling of limitations.[1] In its August 10, 2009 Order, the Court indicated that it would apply the two-step certification process for collective actions as set forth in Edwards v. City of Long Beach, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006). The Court determined that plaintiff had provided sufficient allegations to meet the "lenient" threshold showing that all social workers were subjected to an "informal" overtime system, whereby they were told not to record overtime hours worked on cases unless the cases were over thirty days old. See Dkt. No. 33 at 7.

Pursuant to the Court's conditional certification order, notice and opt-in forms were sent to all current and former social workers. See Declaration of Lauren D. Thibodeaux ("Thibodeaux Decl.") ¶ 2. After the opt-in period, 101 total current and former social workers joined the lawsuit as plaintiffs. Id. The County propounded written discovery consisting of special interrogatories, requests for admissions, and document requests on each opt-in plaintiff. Id. ¶¶ 2–3. The County also noticed the depositions of ten individual opt-in plaintiffs.[2] Id. ¶ 3.

On December 28, 2010, and January 14, 2011, respectively, the County filed

---

[1] The Court denied plaintiffs' first motion for conditional certification of a collective action without prejudice on April 9, 2009. See Dkt. No. 33.

[2] The County asserts that the majority of opt-in plaintiffs did not provide verified responses to the County's written discovery. Thibodeaux Decl. ¶ 3. Additionally, three plaintiffs did not appear for their noticed depositions and were replaced by alternate deponents. Id.

the instant motions for decertification and for terminating sanctions of entry of default judgment against plaintiffs who have failed to respond to discovery, serve verified discovery responses, or appear for deposition; and request for monetary sanctions. On January 19, 2011, and January 24, 2011, plaintiffs filed their oppositions. The County filed its replies on January 31, 2011. Having considered the arguments set forth by both parties, the Court finds and concludes as follows.

**II. BACKGROUND**

Adult Protective Services ("APS") is the public agency charged with ensuring, among other things, that elderly and dependent adults are safe from emotional, physical, sexual or financial abuse, neglect, and exploitation. Declaration of Lorenza C. Sanchez ("Sanchez Decl.") ¶ 2. At any given time, APS employs approximately 150 social workers who investigate allegations of abuse and neglect and provide referral services to various agencies. Declaration of Stacey M. Winters ("Winters Decl.") ¶ 4. There are three types of social workers employed by APS: (1) Central Intake Unit ("CIU") workers; (2) "field" or "caseload carrying" workers; and (3) "after hours" workers. Sanchez Decl. ¶¶ 3–7. CIU workers receive referrals relating to possible abused or neglected adults. Id. Once a referral comes in, CIU workers assess the client's needs and transfer the case to a field social worker. Id. The field social worker assesses the case, provides the assistance required, completes the paperwork, and manages the case until he or she determines that the work on the case is completed and it can be closed. Id. After hours workers provide emergency services to adults in need after normal business hours. Id. If more work is needed on an after hours case, it is transferred to a field social worker. Id. CIU and after hours social workers do not carry normal caseloads. Id.

APS' official policies prohibit off-the-clock work and mandate that social workers be paid for all compensable time. Id. ¶¶ 5–10; Exhs. 5–8. Social workers are required to account for all hours worked on an hour-for-hour basis, and all time worked must be recorded. Id. Except for emergency situations, APS' policy requires

social workers to obtain pre-authorization from their supervisor to work overtime. Sanchez Decl. ¶¶ 11–20; Exhs. 1–3. To gain pre-approval for overtime work, a social worker must: (1) state the name of the case for which overtime is requested, (2) describe the task(s) that will be completed, (3) indicate where the overtime work will be performed, and (4) provide an estimate of the overtime hours needed to complete the task(s). Sanchez Decl., Exhs. 1–3. APS parameters generally limit overtime work to cases that have been open for thirty days or more, as well as emergency situations. Sanchez Decl. ¶¶ 11–20; Exhs. 1–3. Overtime is approved in emergency situations where it is not practical for a social worker to obtain prior authorization. Id ¶ 19.

The County maintains that its official policy is to pay employees for all overtime hours worked, even if an employee should have obtained prior authorization to work overtime, but failed to do so. Id. ¶¶ 20–22. On December 24, 2007, the County issued a memorandum entitled "Timecard Requirements and Procedures," wherein the County outlined guidelines social workers were required to follow when completing their timecards. Declaration of Jason N. Black ("Black Decl."), Ex. E. The memorandum provides, in part:

> All overtime worked must be approved in advance. Once approved, overtime request forms should not be returned to the employee. Rather, the approving supervisor/manager or Timecard Coordinator shall attach the approved request to the corresponding timecard prior to submission to HRD.
>
> Non-receipt of overtime approval will result in non-payment or non-accrual of overtime worked. . . .

Black Decl., Ex. E at 2.

## III. MOTION FOR DECERTIFICATION

### A. Legal Standard

#### 1. The Fair Labor Standards Act

Congress enacted the FLSA in 1938 to establish nationwide minimum wage and maximum hours standards. Moreau v. Klevenhagen, 508 U.S. 22, 25 (1993). Section 7 of the FLSA encourages compliance with maximum hours standards by providing that employees generally must be paid on a time-and-one-half basis for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a). However, under the Fair Labor Standards Amendments of 1985, public employers may compensate employees who work overtime with extra time off instead of overtime pay in certain circumstances. Moreau, 508 U.S. at 24.

#### 2. Collective Actions

A "collective action" differs from a class action. McElmurry v. U.S. Bank Nat'l Ass'n, 495 F.3d 1136, 1139 (9th Cir. 2007). "In a class action, once the district court certifies a class under Rule 23, all class members are bound by the judgment unless they opt out of the suit. By contrast, in a collective action each plaintiff must opt into the suit by 'giv[ing] his consent in writing.'" Id. (citing 29 U.S.C. § 216(b)). As result, "unlike a class action, only those plaintiffs who expressly join the collective action are bound by its results." Id. (citing 29 U.S.C. § 256). Section 216(b) does not require district courts to approve or authorize notice to potential plaintiffs, but it is "within the discretion of a district court" to authorize such notice. Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 173 (1989).

The majority of courts, including this Court, follow a two-step approach for determining whether certification of a § 216(b) collective action is appropriate. See, e.g., Reed v. County of Orange, 266 F.R.D. 446, 449 (C.D. Cal. 2010); Edwards v. City of Long Beach, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006); Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004). Under the two-step approach, the court must first decide, "based primarily on the pleadings and any affidavits submitted by the parties, whether the potential class should be given notice

of the action." Leuthold, 224 F.R.D. at 467. This determination is usually made "under a fairly lenient standard and typically results in conditional class certification." Id. at 467.

At the post-discovery stage of the certification process, the Court engages in a "more rigorous" analysis to determine whether the plaintiffs are "similarly situated" to justify proceeding as a collective action. Reed, 266 F.R.D. at 449 (citing Leuthold, 224 F.R.D. at 467). At the second step, the defendant generally moves to decertify the collective action, but plaintiffs still bear the burden of providing substantial evidence to demonstrate that they are similarly situated. Id. "Whether to decertify is a factual determination, made by the court, based on the following factors: '(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations.'" Edwards, 467 F. Supp. 2d at 990 n.1 (quoting Leuthold, 224 F.R.D. at 467).

**B. Discussion**

**1. Factual and Employment Settings**

The County argues that collective actions are only appropriate in cases where plaintiffs are subjected to a uniform policy requiring off-the-clock work. Mot. at 10. For example, the County contends that "donning and doffing" cases, in which employees challenge an employer's policy of not paying them for putting on and taking off work-related clothing, are well-suited for collective actions. Id. (citing Reed, 266 F.R.D. at 463–64). The County also cites Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530 (N.D. Cal. 2007) as a case that was appropriately maintained as a collective action. In Adams, plaintiffs established the existence of a common policy by providing evidence of defendant's written policy mandating attendance at uncompensated pre-shift briefings and uncompensated pre-employment orientation sessions. Adams, 242 F.R.D. at 537. By contrast, the County argues that a collective action is inappropriate in this case because the County does not have a common

policy, plan, or practice of requiring plaintiffs not to report their overtime hours, and individual issues predominate in this case. Mot. at 12.[3]

The County maintains that although some plaintiffs indicated in initial written discovery responses that they were told by supervisors not to record their overtime hours, the plaintiffs who were deposed all contradicted their responses and testified that no one ever told them not to record the overtime hours that they worked.[4] Id. The County further argues that even if some supervisors told social workers not to record all time worked, the evidence indicates that this was not a common practice and therefore cannot be applied to the class as a whole. Id. (citing Castle, 2008 WL 495705, at *2).

The County further asserts that decertification is appropriate because plaintiff deponents' testimony illustrates that there is no common reason why social workers performed overtime work and why they did not report the hours they worked off-the-clock. Mot. at 14–21. The County contends that contrary to plaintiffs' allegations,

---

[3] The County cites numerous cases where courts have either refused to conditionally certify a collective action or granted decertification because plaintiffs did not identify any company-wide policy or practice that required off-the-clock work. See, e.g., Reed, 266 F.R.D. at 462–463; Castle v. Wells Fargo Fin., Inc., No. C 06-4347 SI, 2008 WL 495705, at *2 (N.D. Cal. Feb. 20, 2008); Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 280–84 (N.D. Tex. 2008); Simmons v. T-Mobile USA, Inc., No. H-06-1820, 2007 WL 210008, at *7–8 (S.D. Tex. Jan. 24, 2007); Johnson v. TGF Precision Haircutters, Inc., No. Civ.A. H-03-3641, 2005 WL 1994286, at *2–4, 6–8 (S.D. Tex. Aug. 17, 2005); Basco v. Wal-Mart Stores, Inc., No. Civ.A. 00-3184, 2004 WL 1497709, at *7–8 (E.D. La. Jul. 2, 2004).

[4] For example, the County cites the deposition testimony of plaintiffs Tamy Le, Garret Endow, and Paulena Falealii-Surkes as contradictory to their written discovery responses suggesting that their supervisors told them not to record their overtime. Mot. at 12–13 (citing Exh. I1, 108:22–109:1; Exh. G1, 80:17–84:20; Exh. H1, 111:8–112:25). The County also cites deponents who admitted that they were never specifically told not to record all hours worked, but testified that their supervisors made statements *implying* that they would not be paid for overtime worked on cases less than thirty days old, and thus should not record such time. Id. at 13 (citing Exh. O1, 122:25–126:6; Exh. N1, 66:8-21:4).

many plaintiffs testified that their claims for uncompensated overtime are unrelated to the County's policy of limiting approved overtime to cases over thirty days old. Id. at 17–21.

Plaintiffs respond that each class members' claim arises from two common unlawful policies applied by the County uniformly to social workers: (1) that no overtime would be paid for work that was completed but not pre-approved, and (2) that the County generally did not approve overtime requests on cases that were less than thirty days old. Opp'n at 1, 18. Plaintiffs point to the December 24, 2007 Timekeeping Requirements Memorandum as evidence of the County's alleged unlawful policy of refusing to compensate social workers who performed overtime unless the worker received prior authorization.[5] Id. at 18. Plaintiffs argue that the written memorandum itself constitutes "overwhelming and insurmountable" evidence that the policy was commonly applied to all members of the collective action. Id. at 19.

Plaintiffs assert that the County's second policy limiting approval of overtime to cases more than thirty days old arose from the settlement of a similar lawsuit brought against the County in Arthur Ellerd v. County of Los Angeles, No. 05-CV-1211 SVW-CW (C.D. Cal. 2005) ("Ellerd I"). Id. According to plaintiffs, after Ellerd I settled, the County adopted its current overtime policy requiring social workers to obtain prior authorization to work overtime, and limiting such authorization to cases more than thirty days old. Id. (citing Black Decl., Exh. D). Plaintiffs contend that the County knew or should have known that social workers had an excessive caseload because the County trained social workers to handle a maximum of fifteen new cases each month. Id. at 20 (citing Black Decl., Exhs. F and G). Plaintiffs argue that despite the County's knowledge that social workers could

[5] Plaintiffs maintain that such a policy is unlawful because all overtime worked must be paid irrespective of whether it was pre-approved. Id. (citing Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981)).

only handle fifteen new cases per month, social workers were assigned more than fifteen new case assignments each month. Id. (citing Black Decl., Exh. H). Plaintiffs argue that because the County knew or should have known social workers could not handle such an intense case load in a normal forty hour work week, the County's policy of requiring social workers to obtain prior authorization to work overtime, and limiting such authorization to cases more than thirty days old, amounts to a "subterfuge policy" by which the County took advantage of plaintiffs by forcing them to work uncompensated overtime. Id. at 20–21.

Plaintiffs rely on responses to the County's interrogatories, wherein each member of the collective action claimed that they worked off-the-clock due to the number of new cases they were assigned and defendant's overtime policies, as evidence that plaintiffs are similarly situated. Id. at 23–24 (citing Exhs. A1–V1). Plaintiffs argue that, contrary to the County's characterization, plaintiff deponents confirmed that they worked uncompensated overtime to keep up with their overwhelming caseload.[6] Id. at 25–27 (citing Pl.'s Exh. 4, Tapia Depo., at 52:3–53:16; Pl.'s Exh. 3, Seche Depo., at 33:6–19). Plaintiffs contend that their testimony was confirmed by at least one of the County's supervisors, who testified that he complained to the County about the overtime policy and social workers' caseload. Id. at 27 (citing Pl.'s Exh. 2, McCormack Depo., at 134:19–135:8).

The County replies that the December 24, 2007 Timekeeping Requirements Memorandum is lawful. Reply at 8–9. According to the County, the statement in the memorandum that "non-receipt of overtime approval will result in non-payment or non-accrual of overtime worked" merely informs employees that overtime cannot be

---

[6] Plaintiffs also attempt to cast doubt on the deposition testimony offered by the County, arguing that the County cherry-picked deponents the County knew had different experiences and claims. Opp'n at 28. The County responds that plaintiffs' argument is a tacit admission that the testimony of the ten deposed plaintiffs suggests that all plaintiffs are not similarly situated. Reply at 17–18.

processed by the County's payroll system until proper documentation, demonstrating either pre- or post-approval, is attached to the timecard with overtime on it. Id. at 9 (citing Reply Declaration of Stacey Winters ("Winters Reply Decl.") ¶¶ 2–3). The County argues that without documentation, there is no way for payroll to ensure that the overtime requested was actually worked. Id. The County further argues that plaintiff has failed to produce substantial evidence that plaintiffs worked off-the-clock because they relied on the 2007 Timecard Requirements Memorandum. Id. at 10. According to the County, no plaintiff testified that they worked uncompensated overtime because they believed they would not be paid for overtime work based on the memorandum. Id. Furthermore, the County argues that when plaintiffs were asked to identify all documents that support their contention that they worked uncompensated overtime, no plaintiff identified the memorandum as evidence that they worked off-the-clock. Id. (citing Responses to Special Interrogatory No. 11). The County further contends that some deponents testified that they submitted and were compensated for overtime worked that was not pre-approved when they received post-approval. Id. at 10–11.[7]

The County further replies that plaintiffs mischaracterize its overtime policy.

---

[7] The County also points out that plaintiffs' allegation that the Timecard Requirements Memorandum is evidence of an unlawful policy is contradicted by plaintiff Ellerd's testimony. Opp'n at 11. At his deposition, Ellerd testified that he recalled reading a section of the County's overtime policy that provides:

> It is also important to emphasize the department's policy that the department does compensate employees for any and all overtime worked according to Fair Labor Standards Act (FLSA) regulations. Therefore, if you work overtime, whether or not prior supervisory approval is granted, you must record such time on your timecard under the hours worked section. All time worked must be accurately reflected on your timecard and at no time is it appropriate for you to work unrecorded overtime.

Exh. A1, 67:22–68:10. Ellerd acknowledged that his practice of not recording all the overtime he worked was in violation of this policy. Id. at 68:14–19.

Reply at 12. First, the County asserts that its overtime policy, while generally requiring pre-approval to work overtime and limiting such approval to cases more than thirty days old, contains exceptions where a social worker provides justification as to why the overtime is necessary. Id. Second, the County argues that plaintiffs' assertion that the County knew or should have known that social workers were assigned more cases than they could handle in a month is false. Id. at 12–13. The County maintains that the fifteen case monthly maximum only applies to new social workers on a "probationary caseload." Id. at 13. The County argues that the purpose of the fifteen case maximum is to give new social workers an opportunity to gradually gain exposure to the types of cases handled by social workers, and to allow them to orient themselves to the job. Id. at 13 (citing Thibodeaux Reply Decl., Exh. 16, 251:20–255:10). The County asserts that plaintiffs' argument that the fifteen new case monthly maximum establishes how much work a social worker can complete in a forty-hour work week is mere "speculation and conjecture." Id. The County argues that because plaintiffs testified that the amount of time required to accomplish their duties varies from case to case, there is no feasible way for the County to know that assigning a social worker more than fifteen new cases per month will necessarily cause that employee to work overtime. Id. at 14–15.

After carefully considering the record in its entirety, the Court finds that plaintiffs have failed to produce substantial evidence that their overtime claims arise out of a single County policy, custom, or practice that results in FLSA violations. The Court finds that contrary to plaintiffs' argument, the County's 2007 Timecard Requirements Memorandum does not constitute substantial evidence of an overarching unlawful policy to only compensate social workers for pre-approved overtime. As the County argues, it is plausible that the statement in the memorandum that "non-receipt of overtime approval will result in non-payment or non-accrual of overtime worked" is intended to inform employees that overtime cannot be processed until proper documentation demonstrating either pre- or post-approval is submitted. See Winters

Reply Decl. ¶¶ 2–3. More importantly, no plaintiff testified that they worked uncompensated overtime because they relied on the memorandum, and numerous plaintiffs testified that they received overtime compensation for overtime work that was not pre-approved. See, e.g., Tapia Depo., Exh. O1, 16:16–20 ("When I go on emergencies and it's past my shift, I send in my PA 158 for the time that I worked after my shift when I'm still doing my home call."); Smith-Thomas Depo., N1, 107:2–24 (paid for overtime worked, even though it was not pre-approved); Cole Depo., Exh. E1, 35:5–36:7, 41:15–42:7 (affirming that social workers could receive post-approval for overtime worked). Furthermore, the record fails to support plaintiffs' allegation that their claims uniformly derive from the County's practice of limiting approved overtime to cases more than thirty days old. Some plaintiffs testified that their overtime claims were related to this policy,[8] however, many others testified that their claims were unrelated to the policy. For example, plaintiff Endow testified that his claim for uncompensated overtime is based on the occasions when he did not report off-the-clock work because a house call lasted longer than expected. Exh. G1, 65:1–67:2. Plaintiff Jacqueline Davis testified that her overtime claim is based on the times she arrived at work early her first year as a social worker "to acclimate [her]self to [her] job and familiarize [her]self before the phones started ringing."[9] Exh. F1, 49:14–50:20. Plaintiff Phylissa Cole testified that she was not aware that social workers could only receive pre-authorization to work overtime on cases more than thirty days old, and instead believed that she could only request approval for overtime when her supervisor announced that overtime was available. Exh. D1, 54:10–60:3. Finally, a handful of plaintiffs, including Sidney

---

[8] See., e.g., Ellerd Depo., Exh. A1, 72:4–8, 73:20–74:18; Bohannon Depo., Exh. B1, 157:5–10, 157:24–161:11; Tapia Depo., Pl's Exh. 4, 52:11–53:16; Seche Depo., Pl.'s Exh. 3, 30:15–33:19.

[9] Like Endow, Davis also testified that she worked some overtime when working on a case that required her to work past the end of the day. See Exh. F1, 37:2–19.

Chow, Ivy Pham, and Paulena Falealii-Surkes, testified that they worked unreported overtime because of perceived pressure from supervisors, who would question them regarding the amount of overtime they requested to complete their work. Exh. C1, 127:17–129:8; Exh. G1, 66:20–68:15; Exh. L1, 89:7–91:13, 96:4–98:17.[10]

For the same reasons, plaintiffs' claims do not uniformly arise from a *de facto* policy of supervisors pressuring plaintiffs to work off-the-clock. Although some plaintiffs testified that they felt implicit pressure from their supervisors to perform uncompensated overtime work, others testified that their supervisors never told them to perform off-the-clock work without reporting it. See, e.g., Le Depo., Exh. I1, 108:22–109:1; Smith-Thomas Depo., Exh. N1, 66:8–13. Tellingly, plaintiff Tapia testified that her supervisor, Vincent McCormack, told her to "claim overtime . . . until the last minute that we're in the office." Exh., O1, 111:2–4. Thus, the Court concludes that plaintiffs have failed to provide substantial evidence that their claims derive from a uniform County *de facto* policy of pressuring social workers to work off-the-clock. See Reed, 266 F.R.D. at 458 (denying certification based on alleged policy to discourage employees from reporting overtime because "it occurred in many different ways, by many different managers, at different times, and in different assignments and locations."); Micron, 2005 WL 5336571, at *2 ("While there may have been pressure for sales representatives to work off-the-clock and some supervisors may have permitted off-the-clock work, the evidence does not show that Plaintiffs were subject to a single decision, policy or practice that permitted off-the-clock work.").

The net effect of the testimony in the record is that plaintiffs' overtime claims arise from a diverse set of factual circumstances. Accordingly, the Court concludes

---

[10] Plaintiff Chow also testified that he believed the County would not pay him the overtime he worked, Exh. C1, 127:17–129:8, and plaintiff Pham testified that she was completely unaware of the County's policy of generally limiting overtime approval to cases more than thirty days old. Exh. L1, 84:4–20.

that plaintiffs are not similarly situated in their factual and employment settings and their claims do not arise from a single policy, custom, or practice.[11]

**2. Defenses**

The County argues that the availability of defenses to some but not all plaintiffs poses significant case management concerns. Mot. at 22. For example, the County points out that to prevail, plaintiffs must establish that the County had either constructive or actual knowledge that plaintiffs were working off-the-clock without pay. Reed, 266 F.R.D. at 460 (citing Pforr v. Food Lion, 851 F.2d 106, 109 (4th Cir. 1988)). The County contends that this case cannot be collectively litigated under the theory that the County should have known that plaintiffs were working off-the-clock due to their overwhelming caseload because the range of plaintiffs' claimed overtime work varies dramatically. Mot. at 23 (citing Responses to Special Interrogatory No. 3, Exhs. A2, B2, C2 . . .O2; Q1, R1, S1 . . . YY1). Moreover, the County argues that the plaintiffs who were deposed only *speculated* that their supervisors knew that they were working off-the-clock. Id. at 24. The County further asserts that many plaintiffs testified that they did not explicitly inform their supervisors that they were performing uncompensated overtime work, and even acknowledged that their supervisors would not know that they were working off-the-clock unless they

---

[11] At oral argument, plaintiffs' counsel argued that the case could be maintained collectively under the theory that the parties could stipulate that all social workers were subject to the County's overtime policies and faced overwhelming caseloads. The Court disagrees. Even if all plaintiffs were subject to the County's overtime policies, as discussed previously, plaintiffs have failed to show that the County's official policies were unlawful. Thus, what plaintiffs must prove is that the County either required or permitted plaintiffs to work uncompensated overtime. The record reveals that plaintiffs worked overtime for a wide array of reasons and that the number of cases social workers are assigned is not directly correlated to the amount of off-the-clock work they perform because some cases are more time intensive than others. Accordingly, to make the requisite showing, plaintiffs must rely upon individualized proof as to why plaintiffs worked off-the-clock. Furthermore, the County has individualized defenses to plaintiffs' claims, which also necessitates individualized trials.

specifically told them. Id. at 24–25.[12]

The County also intends to raise other defenses that it argues will turn on individualized factual and legal questions. Mot. at 26. For example, the County contends that an analysis of whether any time worked is *de minimis* will depend on individualized testimony from each plaintiff as to the administrative difficulty of accurately recording time, the aggregate amount of the time each plaintiff worked off-the-clock, and the regularity of the time worked. Id. (citing Epps v. Oak St. Mortg., No. 5:04-CV-46-OC-10GRJ, 2006 WL 1460273, at *8 (M.D. Fla. May 22, 2006) (decertifying collective action where individualized defenses, including the *de minimis* defense, were available); Smith v. T-Mobile USA, Inc. No. CV 05-5274 ABC (Ssx), 2007 WL 2385131, at *7–8 (C.D. Cal. Aug. 15, 2007) (decertifying where defendants' defenses were varied and observing that "the *de minimis* exception to the FLSA must, by [its] nature, be individualized.")). The County further maintains that certain plaintiffs may be subject to the good-faith defense, while for others the County may be able to establish that some or all of the plaintiffs' alleged overtime does not constitute "work."[13] Id. at 26.

---

[12] The County contends that the deposition testimony of plaintiff Endow is illustrative. Mot. at 25. Endow, a former social worker and current supervisor, testified that he did not know if any of the social workers that he supervised worked overtime without being compensated, and that he could not tell whether the social workers he supervised were working off-the-clock based on their workload. Exh. G2, 20:7–25. Indeed, Endow testified that the only way he could learn whether a social worker performed uncompensated overtime was if the social worker told him. Exh. G2, 20:21–25. Contrariwise, certain plaintiffs who Endow supervises testified that they believed Endow was aware of their off-the-clock work. See Exhs. C3, H3. The County argues that this conflicting testimony demonstrates the need for an individualized inquiry. Mot. at 25 n.18.

[13] For example, the County argues that plaintiff Davis's overtime claim based on her voluntary decision to come in early to "acclimate" to her job does not constitute compensable overtime work. Mot. at 18 n.10 (citing Riley v. Dow Corning Corp., 767 F.

continue...

The Court agrees with the County that proving whether the County either knew or should have known that social workers were performing off-the-clock work will require individualized inquiries. The record suggests that some plaintiffs did not inform supervisors that they were working off-the-clock, and the testimony reflects varying views of whether supervisors knew social workers were working uncompensated overtime. Moreover, at least one supervisor testified that the only way he would know whether a social worker performed uncompensated overtime was if the social worker told him. Exh. G2, 20:21–25. Accordingly, the Court concludes that the factor of whether individualized defenses are involved weighs in favor of decertification.

**3. Fairness and Procedural Considerations**

In evaluating fairness and procedural considerations, courts consider the two primary objectives of a collective action: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Reed, 226 F.R.D. at 462. The Court must also consider whether it can manage the class in a manner that does not prejudice any party. Id

The County argues that fairness and procedural considerations militate against proceeding collectively. Mot. at 27–28. The County contends that because it will need to present evidence specific to each plaintiff to establish its defenses, it will be materially prejudiced if plaintiffs' claims are litigated on a collective basis. Id. at 28. Similarly, the County maintains that the testimony provided by plaintiff deponents suggests that the theories for recovery are so divergent that the case cannot be

---

[13]...continue

Supp. 735, 743 (M.D.N.C. 1991) (finding employee's willingness to come in early to begin preparations for the day's work to be "admirable" but not actionable)).

litigated based on representative testimony.[14] Id. at 28–31. Moreover, the County argues that cases such as this, where there is no uniform policy or practice that permits the Court to make a class-wide determination with regard to whether defendant knew or should have known about plaintiffs' alleged off-the-clock work, are unsuitable for collective action treatment. Id. (citing Epps, 2006 WL 1460273, at *7–10; Reed v. Mobile County Sch. Sys., 246 F. Supp. 2d 1227, 1233 (S.D. Ala. 2003)).

The County further contends that the lack of a common policy or practice necessitates individualized inquiries in this case. Mot. at 32–35. The County argues that resolution of this case will require the Court to undertake "hundreds of fact-intensive mini-trials." Id. at 33. The County asserts that its right to cross-examine plaintiffs is of heightened importance given the perceived inconsistencies between plaintiffs' deposition testimony and their sworn interrogatory responses. Id. at 34.

Plaintiffs respond that decertification is not in the interest of judicial economy because plaintiffs will be forced to file individual claims based on similar evidence. Id. at 30–31.

The County replies that plaintiffs have failed to set forth a workable trial plan and have not identified any representative witnesses or evidence. Reply at 22 (citing Roussell v. Brinker Int'l, Inc., No. H-05-3733, 2009 WL 6496504, at *3 (S.D. Tex. Jan. 26, 2009) ("Plaintiffs have failed to provide a workable trial plan that allows the Court to try the question of manager coercion collectively using representative testimony even at the store level.")). The County contends that plaintiffs' judicial efficiency rationale for maintaining this case as a collective action is not a basis for denying the County its due process rights. Id. at 24 (citing Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 587 (E.D. La. 2008)).

---

[14] The County asserts that its due process right to test the veracity of plaintiffs' claims will be "severely hampered" if plaintiffs are allowed to proceed with representative evidence. Mot. at 30.

The Court recognizes that decertification may result in some overlap among the claims brought by individual claimants, and may cause a certain number of plaintiffs to drop their claims altogether due to the costs associated with pursuing individual litigation. However, because proving plaintiffs claims will require individualized determinations, the Court concludes that proceeding collectively in this case would prove unmanageable and is not in the interest of justice. See Reed, 266 F.R.D. at 450; see also Smith, 2007 WL 2385131, at *8 (where classwide proof not available and claims and defenses must be made individually, decertification is appropriate).

**C. Conclusion**

Because all three factors weigh against proceeding collectively, the Court hereby GRANTS defendant County's motion for decertification.[15]

**IV. MOTION FOR TERMINATING SANCTIONS OF ENTRY OF DEFAULT**

The County moves for an order from the Court issuing terminating sanctions and default judgments against opt-in plaintiffs who have purportedly failed to respond to the County's discovery requests. Mot. at 11. Specifically, the County alleges that of the 101 total opt-in plaintiffs, 21 completely failed to respond to written discovery requests, 35 failed to serve verified discovery responses, and 3 failed to appear at their depositions. Id. Accordingly, the County argues that these opt-in plaintiffs have violated Rule 37 of the Federal Rules of Civil Procedure, and the Court should enter default judgments against them. Id. at 2.

Before a court sanctions a party with terminating sanctions such as dismissal or

[15] Plaintiffs argue that the Court should grant only partial-decertification and consider the possibility of imposing sub-classes. Opp'n at 11, 29 (citing Alvarez v. City of Chicago, 605 F.3d 445, 448 (7th Cir. 2010)). In light of the wide array of factual circumstances giving rise to plaintiffs' overtime claims, the Court finds that subclassing is impractical.

default, it must first determine that the party acted wilfully, in bad faith, or with fault. Conn. Gen. Life Ins. Co. v. New Images, 482 F.3d 1091, 1096 (9th Cir. 2007). The court then weighs five factors to determine wether to impose case-dispositive sanctions:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

Id. (internal quotation marks omitted). "A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe." Id. The Ninth Circuit has ruled that a district court abuses its discretion where it imposes a terminating sanction before considering the impact of such a sanction and the adequacy of less drastic sanctions. See Malone v. U.S. Postal Serv., 833 F.2d 128, 131 (9th Cir. 1987).

The Court finds that the relevant factors weigh against granting the County's motion for terminating sanctions and default judgment against the non-responding plaintiffs. Most importantly, the Court has not warned the non-responding plaintiffs about the possibility of case-dispositive action or imposed less drastic sanctions. See Valley Eng'rs v. Elec. Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998) ("The significance of warning is that a sanction may be unfair if the party could not have realized that it was in jeopardy of so severe a consequence if it was in error regarding its discovery posture."). The fourth factor, which favors dispositions of cases on their merits, also weighs against terminating sanctions. Hernandez v. City of El Monte, 138 F.3d 393, 399 (9th Cir. 1998). Moreover, it appears that a certain number of the opt-in plaintiffs the County seeks terminating sanctions against have actively participated in the litigation. See Opp'n at 3–6; see also Smith v. Cent. Sec. Bureau, Inc., 231 F. Supp. 2d 455, 472 (W.D. Va. 2002) (refusing to enter default judgments against plaintiffs who responded to discovery requests, but failed to do so under

oath). Accordingly, the Court hereby DENIES the County's motion for terminating sanctions of entry of default judgment and default judgment against plaintiffs who have failed to respond to discovery, serve verified discovery responses, or appear for deposition; and request for monetary sanctions.

## V. CONCLUSION

In accordance with the foregoing, the Court hereby GRANTS defendant County's motion for decertification. The Court hereby DENIES defendant County's motion for terminating sanctions of entry of default judgment and default judgment against plaintiffs who have failed to respond to discovery, serve verified discovery responses, or appear for deposition; and request for monetary sanctions.

IT IS SO ORDERED.

Dated: February 16, 2011

Christina A. Snyder
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE